IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| BRENDA D. MOMODOU, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-0395-CV-W-ODS |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for disability and supplemental security income benefits . The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in May 1958 and has completed one and half years of college. She has no prior work experience other than occasions of "trial employment" and other unsuccessful work attempts.[1] In June 1994, Plaintiff filed an application for disability benefits; the application was granted in March 1996 and the onset date was determined to be February 1, 1994. Her benefits were terminated effective January 1, 1997, after the Commissioner determined Plaintiff's drug addiction or alcoholism was a contributing factor to her disability. Plaintiff requested an administrative hearing but she did not appear, so her appeal was dismissed.

---

[1] Since April 1987, Plaintiff has worked as a housekeeper, dietary aid, sales clerk, fast food worker, clothing sorter and hanger, and cashier. She did not hold any of these jobs for more than eight months. She had two jobs after the amended alleged onset date, but neither lasted for more than four months.

Plaintiff filed the instant application for disability and supplemental income benefits on May 21, 2002, which was denied at the administrative level. Plaintiff requested a hearing, at which time her attorney amended the onset date from December 3, 1998, to December 15, 2001. The ALJ determined Plaintiff suffers from depression, bipolar disorder, alcohol dependence and cocaine dependence and that she satisfied the first two steps of the five-step process for analyzing disability claims. He also determined Plaintiff's condition did not meet or equal a listed impairment and she had no prior work experience to which she could return. The focus of the case, therefore, is on the final step of the sequential process: does Plaintiff's residual functional capacity allow her to perform work that exists in the national economy?[2]

A clear understanding of the record requires discussing some events from before Plaintiff's alleged onset date. On August 26, 2000, police officers encountered Plaintiff, who was suicidal and delusional. Plaintiff was admitted to Western Missouri Mental Health Center ("WMMHC"), where she was found to be intoxicated by a combination of alcohol and cocaine. Records from this incident reflect Plaintiff's prior visits to WMMHC due to her drug and alcohol use. Plaintiff successfully completed detoxification and was discharged on September 5 with a GAF score of 51-60. An examination on the day she was discharged revealed Plaintiff to have an intact memory, coherent and logical thought processes, and no delusions or suicidal thoughts. She was prescribed medication for, *inter alia*, depression and upon discharge was sent (pursuant to a court order) to Renaissance West Women's Center for thirty days.

Plaintiff returned to WMMHC for a psychiatric evaluation on November 18 after reportedly drinking two pints of alcohol and becoming involved in physical altercation with an ex-boyfriend. In addition to imbibing alcohol, Plaintiff reported she had not been taking her medication. She was released when her intoxicated state subsided with instructions to follow up with her regular doctor, Dr. Nallu Reddy. Plaintiff did not see Dr. Reddy until January 7, 2002; Dr. Reddy recommended Plaintiff go to AA and refilled

---

[2]Plaintiff also reported injuries from an automobile accident in 2000, but does not allege any of the aftereffects contribute to her disability.

2

her prescription for Prozac and Trazadone. She returned to Dr. Reddy on March 7 with complaints of feeling tired, and Dr. Reddy refilled the prescriptions for Prozac and Trazadone.

On April 10, Plaintiff was taken by ambulance to the emergency room at St. Joseph Health Center. The admitting form expresses it was "difficult to get a clear history from her," but she claimed that she had been held hostage for several hours during which time she had been punched and kicked in the head and abdomen and "forced to drink a liquid that she believes was some type of alcohol." She eventually admitted that she had "actually been using drugs again for the past several days" and, at her request, was taken to Two Rivers Psychiatric Facility for inpatient treatment. There are no records from Two Rivers, probably because she was almost immediately taken from Two Rivers to the emergency room at Baptist-Lutheran Medical Center ("Baptist-Lutheran"). During the examination at Baptist-Lutheran, Plaintiff gave "a rather mixed up story and sometimes says one then another so that none of this makes a lot of sense at this time, it may be a hangover from drugs." By April 18 Plaintiff had returned to normalcy and was responding to medication. She was discharged on April 20 to see Dr. Reddy but there is no record that she did so. No restrictions on activity were imposed.

Plaintiff returned to Baptist-Lutheran's emergency room two days later reporting suicidal thoughts. She had run out of medication so she drank Vodka until she passed out, and had also been using marijuana. Plaintiff was transferred to North Kansas City Mental Health Unit, where she again reported "drinking vodka to control her anxiety symptoms" and, consistent with what the doctor described as a tendency to "minimize her alcohol use" also related that "she drinks only about a half pint of vodka infrequently." Plaintiff stated she had not run out of the medication prescribed by the doctors at Baptist-Lutheran; she simply did not want to take it. She was assessed as suffering from bipolar disorder, depression, stress and alcohol dependence. She also denied using illegal drugs. While at North Kansas City, Plaintiff's GAF score was assessed at 20. The Record does not contain (or, at least, the Court could not identify) documents reflecting Plaintiff's discharge from North Kansas City.

3

On August 17, Plaintiff went to St. Joseph Health Center complaining about continuing pain from a car accident approximately one week prior.[3] She was belligerent and violent toward the doctor and staff, so the police took her to Truman Medical Center. There, she reported that she had been diagnosed with schizophrenia and bipolar disorder but that she stopped taking her medication in May 2002 because she did not believe she really was schizophrenic or bipolar and she did not need the medication. She also admitted to having consumed vodka the previous day, thinking it would make her feel better. Family members related that Plaintiff had been using drugs and alcohol for a long period of time, but Plaintiff continuously denied having used drugs. Plaintiff was discharged on August 23; at that time she denied suicidal/homicidal thoughts, hallucinations, or hearing voices. Her GAF score at discharge was 50 to 60.

As noted earlier, Dr. Reddy had a prior treating relationship with Plaintiff. This relationship extended back to 1998. However, after seeing Plaintiff in March 2002 (as described earlier), the next record of a visit is from August or September 2002, at which time she merely obtained refills of medication. A similar visit occurred in November 2002, at which time Plaintiff told Dr. Reddy she was "ok." Dr. Reddy prepared a form referring Plaintiff to outpatient therapy, but responded "unknown" to questions asking whether Plaintiff had a history of alcohol or drug abuse, suicidal or homicidal ideations, or had been admitted for inpatient treatment. She assessed Plaintiff's GAF score at 35, even though there was nothing in Dr. Reddy's treatment notes to indicate Plaintiff was having problems at that time. In February 2003, Plaintiff denied suicidal or homicidal thoughts, and Dr. Reddy indicated Plaintiff had been compliant with medication and there were no side effects. Plaintiff's medications were refilled.

Plaintiff was brought back to Truman Medical Center in April 2003 after overdosing on her medication and binge drinking. She reported she was "terrified" because she had been subpoenaed to testify against her ex-boyfriend for stabbing her

---

[3]The effects of the accident itself do not form a basis for Plaintiff's disability claim, so the details need not be recounted.

4

in 2001. She was discharged after three days with plans to check into a facility for a thirty day inpatient program for drug and alcohol abuse.

Plaintiff saw Dr. Reddy twice in May 2003. At the second visit – and the last one identified in the Record – Plaintiff told Dr. Reddy "I need a letter as I need some money and am having some problems." This appointment was held approximately ten days before the administrative hearing. Four days after the hearing, Dr. Reddy prepared a Medical Assessment indicating Plaintiff had a poor ability to use judgment, deal with work stress, interact with supervisors, maintain attention or concentration, understand and carry out complex or detailed instructions, and function independently. She rated Plaintiff as "fair" in her ability to follow rules, understand and carry out simple instructions, and work with co-workers and the public. Finally, she indicated Plaintiff had marked restrictions on daily activities, and maintaining social functioning, concentration, persistence and pace. Dr. Reddy attributed these limitations to depression and nightmares of past abuse when she was a child, and further indicated these opinions would not change even if substance abuse was not considered. No narrative was provided to explain any of Dr. Reddy's opinions.

At the hearing, Plaintiff testified that after December 15, 2001, she began hearing voices and attributed this to being sexually abused when she was fourteen. The voices told her to stop taking her medication, so she did; she was fired from her job at the time (at a thrift store) within four months. She began using cocaine in 1998 (or perhaps earlier; her testimony on this point was inconsistent), but denied using any within the last two years. She testified she last drank alcohol in April 2003, and that episode ended a two and a half year period of sobriety. Upon specific questioning she acknowledged alcohol led to the incident in August 2002 but denied drinking or using drugs at any other time that year – including April 2002. She described the April 2003 incident as involving her fear over telling someone she did not want to marry him. Contrary to all indications from the medical records, Plaintiff testified she hears voices even when she is sober and even when she takes her medication.

The ALJ elicited testimony from a medical expert, Dr. Gary Gard. He observed that Plaintiff's testimony contradicted the medical information, and the medical

5

information reflected Plaintiff's use of drugs and alcohol made material contributions to her limitations. Without considering the limitations imposed by Plaintiff's use of drugs and alcohol, Dr. Gard testified Plaintiff had no limitations in daily activities and moderate difficulties maintaining social functioning, concentration, persistence and pace. With the effects of alcohol and drugs, Plaintiff was expected to have moderate restrictions on daily activities and marked difficulties in maintaining social functioning, concentration, persistence and pace.

The ALJ also elicited testimony from a vocational expert ("VE"), and asked her to assume a person of Plaintiff's educational and (limited) employment background who could lift up to twenty pounds occasionally and ten pounds frequently, stand for six hours, sit for six hours, needed to avoid ladders, and had moderate difficulties maintaining social functioning, concentration persistence and pace. The VE testified such a person could perform work in the national economy. The VE was also asked to assume the same individual, except the person had moderate limitations in daily activities and marked limitations in social functioning, persistence, concentration and pace. The VE testified that the second hypothetical person could not perform work in the national economy. Finally, upon further questioning, the VE explained that a GAF score under fifty generally meant the individual could not work because such a score would reflect significant problems in their life. However, because the score is subjective, the VE testified that a single score should not be relied upon for these purposes; instead, a pattern of scores over time should be examined.

The ALJ concluded Plaintiff's residual functional capacity, including limitations imposed by her substance abuse disorders, precluded her from performing work in the national economy. However, in the absence of the effects of substance abuse, Plaintiff retained the residual functional capacity to perform work in the national economy. Consequently, he denied her application for benefits.

I. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

The role of Plaintiff's substance abuse requires special attention. "Where drug or alcohol abuse is a contributing factor to the determination of the disability, a plaintiff is not entitled to disability benefits unless she would be disabled if she stopped using drugs and alcohol." Slater v. Barnhart, 372 F.3d 956, 957 (8th Cir. 2004) (citing, *inter alia*, 42 U.S.C. § 423(d)(2)©). Plaintiff bears the burden of proving his alcohol or drug abuse was not a contributing factor. Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003).

Plaintiff contends the ALJ erred in failing to defer to Dr. Reddy's opinion that Plaintiff was disabled with or without consideration of Plaintiff's drug and alcohol abuse. Generally speaking, a treating physician's opinion is entitled to deference. This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Here, the record clearly reflects Plaintiff's medical and mental conditions are amenable to treatment, and the only time they qualify as disabling is when Plaintiff fails to take her medication or abuses alcohol or drugs. All incidents of hospitalization were attributed to

7

alcohol or drug abuse, and upon detoxification and discharge Plaintiff was consistently described as doing fine and possessing a GAF above 50. Dr. Reddy's opinion does not acknowledge Plaintiff's drug and alcohol abuse, much less discuss or explain how she determined Plaintiff's residual functional capacity without considering the effects of that abuse. There is even a legitimate question regarding Dr. Reddy's awareness of the existence and extent of Plaintiff's drug and alcohol abuse, given that (1) Plaintiff has a history of denying such problems and (2) Dr. Reddy's notes do not discuss these problems.

Acknowledging the law regarding the effect of alcohol and drug abuse on a disability determination, Plaintiff argues the ALJ failed to recognize Plaintiff's mental impairments and substance abuse are so intertwined that separate consideration is impossible. The Court disagrees. First, as noted above, Plaintiff has been consistently described as having the functional capacity to work when she (1) refrains from using drugs and alcohol and (2) takes the medication necessary to treat her depression and bipolar disorder. Also as noted above, Plaintiff bears the burden of demonstrating the effects of substance abuse are not material to her alleged disability. Finally, there is no medical evidence suggesting these matters are inextricably intertwined.

Plaintiff also challenges the ALJ's credibility determination. This seems to be a non-issue in light of the ALJ's conclusion regarding the effects of drug and alcohol abuse, which does not depend on Plaintiff's credibility. Nonetheless, the Court concludes the ALJ was entitled to discount Plaintiff's credibility because her testimony conflicted with statements she made to doctors when she sought treatment, her testimony and statements to doctors conflicted with objective medical data (e.g., her representation that she had been diagnosed as schizophrenic), and Plaintiff's poor work history (which demonstrated a strong motivation to shade testimony in order to obtain benefits).

## III. CONCLUSION

For these reasons, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

                                              /s/ Ortrie D. Smith
                                              ORTRIE D. SMITH, JUDGE
DATE: March 2, 2006                      UNITED STATES DISTRICT COURT